THIS was an action of ejectment to recover a house and lot and premises situate in the town of Dover. Both parties to it claimed under the same title, derived from Henry Stout, deceased, who died intestate seized of the premises, leaving to survive him as his heirs at law three children, Henry Stout and Emmanuel J. Stout, the real plaintiffs in the action, and a daughter who intermarried with and became the wife of Rev. Henry Hall, but died soon after the birth of her first child, which if born alive lived but a very short time. In the partition of the real estate of the deceased, their father, the premises in question had been assigned to the daughter, and since her death the real defendant in the action had been in possession of them under a lease from her husband, Mr. Hall, who claimed to be entitled to them for the term of his life as tenant by the courtesy; and the only question of fact involved in the case was whether the issue was born alive.
Dr. George Gooddell, of Burlington County, New Jersey, a witness for the plaintiffs, testified that he resided eight miles from Bordentown and had been acquainted with Mrs. Hall more than a year before her death. She and her husband resided about seven miles from him. They were married in the latter part of the year 1869 or in the first part of the year 1870, and she died in about eighteen months afterward. She was confined and delivered on the 25th of April, 1871, and died on the 1st day of May following. She was in labor about fifteen hours after his arrival, and he was with her during the whole of the time after that until her delivery. She was seized with puerperal *Page 16 
fever. He discovered in the child no evidence of respiration or breathing, nor any sign of muscular motion. He afterward said that he did not say, or mean to say, that the child did not breathe, but only that he did not observe it. It was a large and well-developed child, and came after its full time. He did not specially look for such signs of life. It was a perfect child, full grown and large. When he said he saw no signs of motion in it, he meant no external signs of motion in the muscles or limbs of it. But he was not looking for any signs of motion in it.
On the next witness, Hon. John A. Nicholson., being called, the counsel for the plaintiff announced to the court that they proposed to prove by him the reputation in the family at the time of its birth that it was not born alive.
Smithers, for the defendant, objected to the admissibility of such evidence in such a case. 1 Greenl. Ev. sec. 138.
Comegys, for the plaintiff, contra, cited 1 Greenl.Ev., secs. 103, 104.
The Court overruled the objection and admitted the testimony.
The witness then stated that his wife and Mrs. Hall were cousins, and the reputation in the family is that she died without having issue born alive. He heard it about the time of her death, but he had since heard it contradicted by Mr. Hall. It was buried here in the Presbyterian church-yard, and the body was sent here from New Jersey by express, without any one to accompany it, except the officers of the express company who had it in charge. It arrived at night between eight and nine o'clock and was buried the same night without any funeral ceremony.
The plaintiffs here rested.
Dr. George Gooddell was then called to the stand as a witness by the counsel for the defendant, and further testified that *Page 17 
the mother had reached the full term, but her labor was a protracted one, and undoubtedly had the effect to render the child more feeble. It was alive in the womb. After delivery its flesh was firm, its lips were ruddy, and its whole appearance was a natural one. The presentation was also a natural one. The beating of its heart was strong, and he not only felt it, but also heard it. The pulsation of the umbilical cord was also strong, and was also strong in the temporal artery; the cord, too, was natural and healthy in its appearance, and it was not until twenty minutes after the child's complete birth that the cord was severed, and the heart continued to beat for about five minutes after that; and the temporal artery also, but not so strong as the heart. Dr. Page and himself did what was usual in such cases to prolong the life of the child, by dashing water on its body, blowing into its lungs, rotating it from side to side, and, as a last resort, by a warm bath, and it was in the bath it died. In his opinion it had, during that time, an independent circulation and existence of its own, and was a living child. And he so thought then and had so thought ever since. It died, he thinks, of exhaustion consequent upon the protracted labor of the mother. The lips continued red after the umbilical cord was severed, and gradually faded. He did not look for any respiration or muscular motion, because he had no doubt that it was all that time a living child, and his only concern and object was to preserve and prolong the life of it.
On cross-examination he added that the mother was seized with puerperal convulsions two or three hours before her delivery, when he sent for Dr. Page, Before his arrival he had bled her, and soon after his arrival they concluded to apply the forceps in her delivery. After that there were at intervals pains, or efforts on the part of the mother to deliver the child, but they became more feeble, and it was at such intervals, perhaps as many as twelve in all, they would use the instruments, and they were in all about a half an hour in using them. Such instruments were very frequently used in delivery, and there was no perceptible injury produced by the use of them in her case. They resorted to dashing cold water a dozen times on the body of the child before the umbilical cord was cut, and blowing into *Page 18 
its mouth and rotating its body from side to side and by pressure upon and compression of the chest to produce respiration; that was their object; but it did not produce either respiration or crying that he could perceive. It was very soon after the circulation had ceased in the umbilical cord that it was cut. The child was about eighteen inches long. It was in the bath from five to ten minutes, and all pulsation in it had ceased before it was removed from it. The object of all these efforts was to produce respiration, which he was anxiously hoping for all the while, but which he did not at any time perceive. It had an independent circulation of its own after the delivery, and by that he meant that there was then no muscular connection subsisting between it and the mother. The pulsation in the cord after delivery usually continues from three to live minutes, and soon after respiration begins it ceases, and it is usual to sever the cord as soon as respiration ensues and the pulsation in its ceases. The pulsation of the heart and the temporal artery continued twenty-five or thirty minutes after the child was delivered. The blood and circulation of the child in the womb is entirely separate and distinct from the blood and circulation of the mother, and it may continue alive in the mother's womb after her death and be taken alive from it after her death, as has been done in the Cæsarian operation. There are well-authenticated cases in which the suspension of respiration has continued for as much as thirty minutes after delivery.
Dr. Richard A. Page, of Columbus, in Burlington County, New Jersey, testified that he was in attendance also on Mrs. Hall in her confinement, and reached there about nine o'clock that evening, and she was delivered about eleven o'clock. Found her condition and appearance as before described by Dr. Gooddell. The child was born alive and continued so after its complete delivery from the mother about thirty minutes and five to six minutes after the separation of the umbilical cord. The pulsation in the cord had then ceased, and there was then a separate and distinct circulation of the blood of the child independent entirely of the mother. It was then alive, he had no doubt, and that life was entirely independent of the mother. It died in the bowl, a natural death, produced, he thought, by the *Page 19 
protracted labor of the mother in part, and in part, perhaps, from the congestion of the brain. He was satisfied that there was circulation of the blood going on from the distinct throbbings of the heart. They were endeavoring to establish respiration, and were not watching for any slight manifestation of it, but for a gasp or a cry. They considered and they knew that there was life in it, or they would not have made any effort, much less such particular efforts, to establish respiration. He gave the certificate that it was still-born, because it is the custom, sanctioned by practice and by medical authority, to give such a certificate for such a purpose as that for which it was given when a child dies in the womb, or in a short time after its birth, from natural causes; and if respiration in this case had been established and it had breathed, but had died in so short a time after its birth, he would have given the same certificate. All such are called still-born, and are so termed by custom and by physiologists and by physicians in giving such certificates.
Dr. Alexander Penrose, of Philadelphia, and professor of midwifery and obstetrics in the University of Pennsylvania, was then called to testify as an expert, and stated that he had heard the testimony of both of the preceding witnesses, and his opinion, based upon it, was that the child was born alive, and he had no doubt of it. The first or chief sign or evidence of life in all cases is the beating of the heart, and he was clearly of opinion from all they had stated in regard to it that it had a circulation and existence absolutely independent of the mother.
Dr. John J. Reese, of the same city, and professor of medical jurisprudence in the same university, and practicing physician of thirty years' standing, was next called also to testify as an expert, and after stating that he had heard the testimony of Dr. Gooddell and Dr. Page in the case, added that the opinion which he had upon it was that the child was alive after its birth, and had an absolutely independent existence of its own after the umbilical cord was cut, and which after that could not have been in any degree dependent upon the mother. The best sign of life is the beating of the heart. Life may exist, but cannot be continued without breathing. The pulsation of the umbilical cord proceeds entirely from the beating of the child's heart, *Page 20 
and in no degree from the circulation of the blood in the mother. The pulsation of the cord before delivery is always positive and indubitable proof that the child is alive in the womb of the mother. In his opinion that child's heart beat and moved by virtue of its own inherent vital force and power. The beating of the heart and the pulsation and circulation of the blood through the arteries and veins of the body is the best evidence of the existence of life. In his opinion upon the facts proved in this case there must have been some slight but imperceptible breathing on the part of this child before it died and after the cord was divided. Life cannot continue more than two or three minutes with the air entirely excluded from the lungs. The lips and lungs are full of blood, and in health are red or ruddy in color, and the existence of that color in the lips is one of the best evidences of life, for as soon as death takes place that color fades from them and they become pale. After a child is completely delivered, even before the cord is severed, there can rarely be any physiological connection existing between it and the mother; but so long as the placenta continues to adhere to the walls of the mother's womb, the fœtal circulation through the cord may continue even after complete delivery.
Two other physicians were examined and testified as experts on behalf of the defendant in the case, and expressed their opinion on the evidence of the attending physicians that the child was born alive. And three were then called and examined as experts on the other side, the first of whom testified that he had an experience of thirty-seven years in the practice of his profession, and that it was not uncommon in cases of suspended animation on the birth of children to witness such indications as had been detailed in their testimony, and in his opinion they may be the result of a residuum of the fœtal circulation merely, and this may be after the umbilical cord has been divided and the connection with the mother has been severed. He considered and called a child so born, and dying without breathing or any motion of the limbs or muscles, a still-born child, but a newborn child that dies after having breathed he never called or considered a still-born child, but a child born alive. After the severance of the cord the circulation he had spoken of might *Page 21 
continue several minutes before it would cease and death would be evident. The second expressed the same opinion and said fœtal life continues after birth so long as it continues to derive its nourishment from its fœtal condition and connection, and until it begins to derive its support from another source and respiration begins; and it cannot have a complete and independent existence of its own until then. The last concurred in the same opinion.
Saulsbury (Comegys with him), for the plaintiffs: The child was not born alive, or was not a living child at its birth, for there was no independent existence of its own at any time, even after the navel cord was cut, if the pulsation of the heart and the circulation of the blood was but a continuation of the pulsations of the heart and of the circulation of the blood which existed whilst it was yet in its mother's womb and at the instant of its extrusion from it. For although that might be called life in a limited and imperfect sense, it was not life in the sense contemplated and required in the common law of the land to entitle the father to the real estate of the mother, and his wife, on her death, for the term of his life, as tenant by the courtesy. Without respiration or breathing the breath of life after its birth there could be no such life as the law recognizes in this child. And if that the very inception of its independent self-existence as a living creature from the hand of its divine Creator never takes place, and in the course of nature never can take place, it never can be alive, and, of course, never can be born alive in the true and proper meaning of that term. Marsellis v. Thalhimerand others, 2 Paige 35; 4 Vez. 227; Paine's Case, 8 Rep. 34. The judicial decisions on the question in civil cases are but few it seems. In prosecution for infanticide, however, the cases in which the question has arisen have been numerous, and in all such eases it seems to have been held necessary to prove respiration on the part of the infant after its birth and independent circulation by means of it to convict the accused of the crime of killing it. Rex v. Poulten, 24E. C. L. Rep. 344; Rex v. Enoch, 24 E. C. L. Rep. 446; Rex
v. Brain, 25 E. C L. Rep. 433; Rex v. Sellis, 32 E. C. L.Rep. 767; Rex v. *Page 22 Crutchley, 32 E. C. L. Rep. 749; Taylor's Med. Jur. (Fish v.Palmer) 480; Beck's Med. Jur. 410; 3 Greenl. Ev., sec. 136;Wills on Circum. Ev. 230; Whart. Amer. Cr. Law 286, 342, 343;Bonv. Law Did. 48; Whart. Stille's Med. Jur. 337. Under the later rulings pulsation may now be sufficient, but it must be proved to have continued long enough after the division of the umbilical cord to show that it was the result of respiration, and that the child must have had by its respiration an independent circulation and existence of its own. It was incumbent upon the defendant to prove that the child was born alive or the plaintiffs must recover. Taylor's Med.Jur. (Lewellan v. Gardner) 214. And if the jury should have a doubt as to that they must find for the plaintiffs.
Smithers (Ridgely and Layton with him), for the defendant; The contention on the other side is that it must be proved that the child breathed, or there was not sufficient evidence in law that it was born alive, but there is no such principle of law in the case. The issue must be born alive is all the rule of law prescribes and requires in the case. Co. Lit. Ten. by the Court. But this rule has been modified by positive law in some other countries, as in France and Germany, and is therefore denominated in those countries legal life for the purposes of succession to property. Physiological or natural life, however, is all that is required by the laws of England and this State. Under our law the question simply is, Was it born alive or born dead? And nothing more nor less than that. Respiration or breathing is but one of the evidences or manifestations of life among several others well known and recognized both in law and fact.Rex v. Brain, 23 E. C. L. Rep. 433. In that case the respiration or breathing of the infant in question was absolutely negatived by the proof in it. Wills on Circum. Ev. 270. The child may acquire an independent circulation without having breathed, nor is it material that it remains attached to the mother by the umbilical cord, if it has acquired an independent circulation. 3 Greenl. Ev., sec. 136;Whart. Amer. Cr. Law 343, 358, 359, 371; Tayl. Med. Jur. (Fish v.Palmer) 207, 213. Sir John Stewart, Vice-Chancellor, in a case of succession to property in *Page 23 
1851, said on this subject that the beating of the heart is sufficient to constitute legal evidence that the child was born alive. A single vital function, such as pulsation clearly proved, is sufficient legal evidence that the issue was born alive. Paine's Case, 8 Rep. 34;Tayl. Med. Jur. (Rex v. Brain) 354 (Rex v. Sellis) 354; 3Greenl. Ev., sec. 136. If the jury should believe from the evidence in the case that the child was born alive the plaintiffs were not entitled to recover and their verdict should be in favor of the defendant.
That the existence of independent, separate life in the child after birth is a fact to be proved by competent and credible testimony in such a case as this, and the burden of proving this fact rests on the defendant in it, and therefore they must be satisfied from the evidence which they had heard at the bar of the court that the newly born child in question was wholly brought forth from the body of the mother, and that it was born alive, having an independent circulation and existence of its own, in itself and of itself, not being dependent upon the mother, but entirely independent of her, a life and circulation existing in the child apart from the mother by force of the child's own proper, inherent vitality. Whether the child of which Mrs. Angelica S. Hall was delivered on or about the 25th of April, 1871, was born alive, having such an independent circulation and existence of its own, was a question of fact to be determined by the jury from all the evidence before them. The court cannot pass upon that question or express any opinion in regard to it. It is proper, however, that we should say to you that in such a case as this there are no legal presumptions in favor of the existence of life in a newly born child, on the contrary, the fact of life, independent life and existence in it, must be proved as any other fact in order to entitle the father of it to claim and hold the real estate in question for the term of his own life as tenant by the courtesy. Mere fœtal life, that is to say, that life which is incepted in the womb of the mother, and which is derived from and dependent upon the mother, is not sufficient for this purpose. On the contrary, the child's life must in fact be distinct from and independent of the mother. *Page 24 
It must have an independent existence of its own, manifested by an independent circulation within its own body after birth, Respiration or breathing is certainly evidence of life, but we do not think it is necessary to prove the fact of respiration from actual observation if such independent circulation is established and shown. It has been held that life may exist in a newly born child without proof that it was observed to have breathed; indeed, it has been held that life may exist for a time without respiration. It is only one of the signs which manifest the existence of life. There are other signs or indications of life, among which the beating of the heart and pulsation of the arteries after the separation of the child from the body of the mother may be considered satisfactory evidence of life in the child, because they show the fact that circulation has been established in the body of the child and was maintained and carried on in the body of the child independently of the mother, it having then no connection with the mother. Which fact, namely the fact of an independent circulation after the navel cord has been severed, may be considered by the jury as evidence that the child in this case had a separate and independent existence or life of its own and was born alive, although there was no proof from observation that the child had ever actually breathed.
If, therefore, the jury should be satisfied from the evidence that the child which was brought forth from the body of Mrs. Angelica S. Hall was born alive, having an independent circulation and existence of its own in the sense and meaning in which he had endeavored to explain the matter to them, their verdict should be in favor of the defendant, or not guilty of the trespass and ejectment in the declaration alleged. Otherwise, it should be in favor of the plaintiff, or guilty thereof.
 The defendant had a verdict. *Page 25